# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| EMSAT ADVANCED GEO-LOCATION TECHNOLOGY, LLC, | § § § | |
| and | § | Case No. 2:08-cv-381 |
| | § | |
| LOCATION BASED SERVICES LLC, | § § | |
| Plaintiffs, | § | **JURY TRIAL DEMANDED** |
| | § § | |
| v. | § § | |
| METROPCS COMMUNICATIONS, INC., METROPCS WIRELESS, INC., CENTENNIAL COMMUNICATIONS CORP., LEAP WIRELESS INTERNATIONAL, INC., CRICKET COMMUNICATIONS, INC., ETEX TELEPHONE COOPERATIVE INC., and ETEX COMMUNICATIONS, L.P., | § § § § § § § § § § § | |
| Defendants. | | |

## DEFENDANT METROPCS WIRELESS INC.'S ANSWER AND COUNTERCLAIMS TO PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT

Defendant MetroPCS Wireless, Inc. ("MetroPCS") files this Answer and Counterclaims to Plaintiffs EMSAT Advanced Geo-Location Technology, LLC's and Location Based Services LLC's (collectively "EMSAT's") First Amended Original Complaint (the "Complaint").

### THE PARTIES

1.      MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Complaint and therefore denies them.

2.      MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the Complaint and therefore denies them.

3.      MetroPCS denies that Wireless's current principal place of business is located at 8144 Walnut Hill, Suite 800, Dallas, Texas 75231.  Wireless's current principal business is located at 2250 Lakeside Boulevard, Richardson, Texas 75082.  MetroPCS admits the remaining allegations contained in paragraph 3.

4.      MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 of the Complaint and therefore denies them.

## JURISDICTION AND VENUE

5.      Paragraph 5 of the Complaint sets forth legal conclusions to which no response is required.  MetroPCS admits that the Complaint alleges infringement under the United States patent laws and that this Court has subject matter jurisdiction over patent law claims.  MetroPCS denies any remaining allegations in paragraph 5.

6.      MetroPCS admits that this Court has personal jurisdiction over it in this particular action and that it has conducted business in the State of Texas.  MetroPCS admits that Wireless' products have been sold in the United States, the State of Texas, and the Eastern District of Texas.  To the extent the remaining allegations of paragraph 6 are directed at MetroPCS, they are denied.  To the extent the allegations of paragraph 6 are directed to other entities, MetroPCS lacks sufficient information to admit or deny the allegations of paragraph 6, and therefore denies them.

7.      Paragraph 7 of the Complaint contains legal conclusions that do not require an admission or denial.

## BACKGROUND

8.      MetroPCS admits that U.S. Patent No. 5,946,611 ("'611 Patent") is entitled "Cellular Telephone System That Uses Position of Mobile Unit to Make Call Management Decisions," and Date of Patent of August 31, 1999.  MetroPCS admits that a copy of the '611

Patent was attached to the Complaint as Exhibit A.  MetroPCS admits that U.S. Patent No. 6,324,404 ("'404 Patent") is entitled "Cellular Telephone System That Uses Position of a Mobile Unit to Make Call Management Decisions," and Date of Patent of November 27, 2001. MetroPCS admits that a copy of the '404 Patent was attached to the Complaint as Exhibit B. MetroPCS admits that U.S. Patent No. 6,847,822 ("'822 Patent") is entitled "Cellular Telephone System That Uses Position of Mobile Unit to Make Call Management Decisions," and Date of Patent of January 25, 2005.  MetroPCS admits that a copy of the '822 Patent was attached to the Complaint as Exhibit C.  MetroPCS admits that U.S. Patent No. 7,289,763 ("'763 Patent") is entitled "Cellular Telephone System That Uses Position of Mobile Unit to Make Call Management Decisions," and Date of Patent of October 30, 2007.  MetroPCS admits that a copy of the '763 Patent was attached to the Complaint as Exhibit D.  MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 8 of the Complaint and therefore denies them.

9.      MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Complaint and therefore denies them.

10.      MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the Complaint and therefore denies them.

11.      MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 of the Complaint and therefore denies them.

12.      MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint and therefore denies them.

13.     MetroPCS denies the allegations against MetroPCS contained in paragraph 13 of the Complaint.  MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 13 of the Complaint and therefore denies them.

## COUNT I:  INFRINGEMENT OF THE '611 PATENT

14.     MetroPCS repeats and incorporates by reference the answers to paragraphs 1-13, as though fully set forth herein.

15.     MetroPCS denies the allegations against MetroPCS contained in paragraph 15 of the Complaint.  MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 15 of the Complaint and therefore denies them.

16.     MetroPCS denies the allegations against MetroPCS contained in paragraph 16 of the Complaint.  MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 16 of the Complaint and therefore denies them.

## COUNT II:  INFRINGEMENT OF THE '404 PATENT

17.     MetroPCS repeats and incorporates by reference the answers to paragraphs 1-13, as though fully set forth herein.

18.     MetroPCS denies the allegations against MetroPCS contained in paragraph 18 of the Complaint.  MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 18 of the Complaint and therefore denies them.

19.     MetroPCS denies the allegations against MetroPCS contained in paragraph 19 of the Complaint.  MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 19 of the Complaint and therefore denies them.

## COUNT III:  INFRINGEMENT OF THE '822 PATENT

20.     MetroPCS repeats and incorporates by reference the answers to paragraphs 1-13, as though fully set forth herein.

21.     MetroPCS denies the allegations against MetroPCS contained in paragraph 21 of the Complaint.  MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 21 of the Complaint and therefore denies them.

22.     MetroPCS denies the allegations against MetroPCS contained in paragraph 22 of the Complaint.  MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 22 of the Complaint and therefore denies them.

## COUNT IV:  INFRINGEMENT OF THE '763 PATENT

23.     MetroPCS repeats and incorporates by reference the answers to paragraphs 1-13, as though fully set forth herein.

24.     MetroPCS denies the allegations against MetroPCS contained in paragraph 24 of the Complaint.  MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 24 of the Complaint and therefore denies them.

25.     MetroPCS denies the allegations against MetroPCS contained in paragraph 25 of the Complaint.  MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 25 of the Complaint and therefore denies them.

## NOTICE OF PUBLISHED PATENT APPLICATION

26.     MetroPCS repeats and incorporates by reference the answers to paragraphs 1-13, as though fully set forth herein.

27.     MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 of the Complaint and therefore denies them.

28.     MetroPCS denies the allegations against MetroPCS contained in paragraph 28 of the Complaint.  MetroPCS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 28 of the Complaint and therefore denies them.

29.     Paragraph 29 of the Complaint does not require a response.

30.     Paragraph 30 of the Complaint does not require a response.

## JURY DEMAND

31.     Paragraph 31 of the Complaint does not require a response.

## PRAYER FOR RELIEF

32.     MetroPCS denies that EMSAT is entitled to the relief sought in the prayer or any relief whatsoever.

## AFFIRMATIVE DEFENSES

Without assuming any burden other than that imposed by operation of law or admitting that it bears the burden of proof with respect to any of the following, Defendant MetroPCS alleges as follows:

### FIRST DEFENSE

(Failure to State a Claim)

EMSAT fails to state a claim upon which any relief may be granted.

### SECOND DEFENSE

(No Infringement)

MetroPCS does not infringe any valid claim of the '611, '404, '822, or '763 patents.

### THIRD DEFENSE

(Invalidity)

One or more of the claims of each of the '611, '404, '822, and '763 patents are invalid for failing to comply with the conditions and requirements of patentability set forth in the United

States Patent Laws, Title 35 U.S.C., including specifically §§ 102, 103, and/or 112, and the rules, regulations, and laws pertaining thereto.

### FOURTH DEFENSE

(Laches)

EMSAT's claims are barred, in whole or in part, by the doctrine of laches.

### FIFTH DEFENSE

(Unclean Hands)

EMSAT is barred from asserting its claims of patent infringement by the doctrine of unclean hands.

### SIXTH DEFENSE

(Waiver/Estoppel)

EMSAT is barred from asserting its claims of patent infringement by the doctrines of waiver and estoppel.

### SEVENTH DEFENSE

(Failure to Join Required Parties)

EMSAT is barred from asserting its claims of infringement because of its failure to join required parties under Fed. R. Civ. P. 19 who have an interest in the subject matter of the action and without whom disposing of the action may as a practical matter impair or impede their ability to protect such interest.

### EIGHTH DEFENSE

(Inequitable Conduct)

**Applicants Owe A Duty of Candor and Good Faith to the PTO**

Patent applicants and those substantively involved in the preparation or prosecution of a patent application owe a "duty of candor and good faith" to the PTO.  37 C.F.R. § 1.56(a) (2008);  *see also Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).  This duty of good faith and candor includes the duty to disclose adverse decisions in related, co-pending applications.  *See McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 487 F.3d 897, 924-25 (Fed. Cir. 2007).  EMSAT has failed to fulfill its duty of candor and good faith to the PTO.

**The Dennison Patent Family Tree**

The asserted '611, '404, '822 and '763 patents all name Everett Dennison as the first inventor.  The Dennison patent family tree begins on December 26, 1991, with the filing of Application Serial Number (hereinafter "Application") 07/813,494, which issued on August 10, 1993 as U.S. Patent No. 5,235,633 (the "'633 patent").  Applicants submitted the '633 patent for reissue on November 9, 1995 as Application 08/552,486.  The '486 Application was reissued on October 6, 1998 as RE35,916.

On May 7, 1993, Applicants filed Application 08/057,833 which was a continuation-in-part application ("CIP") of the '494 Application.  The '833 Application was ultimately abandoned.  On March 13, 1995, Applicants filed Application 08/402,976, which was a continuation of the '833 Application.[1]  The '976 Application was also abandoned.

On October 23, 1995, Applicants filed Application 08/555,884 as a CIP of the '976 Application.  The '884 Application issued as U.S. Patent No. 5,546,445 on August 13, 1996.

---

[1] The face of U.S. Patent No. 5,815,814 lists Application No. 08/402,976 as a continuation of Application No. 08/057,833 while the face of U.S. Patent No. 6,324,404 lists Application No. 08/402,976 as a continuation-in-part of Application No. 08/057,833.  Although it is unclear from the face of these two patents whether Application No. 08/402,976 is a continuation or continuation-in-part application, MetroPCS will refer to Application No. 08/402/976 as a continuation.

During the pendency of the '884 Application, Applicants filed Application 08/884,082 as a CIP on March 21, 1996, and Application 08/670,281 as a division on June 21, 1996.  The '082 Application issued as U.S. Patent No. 6,324,404 on November 27, 2001, and the '281 Application issued as the asserted '611 patent on August 31, 1999.

On September 15, 2000, Applicants filed Application 09/662,613 as a continuation of the '082 Application.  The '613 Application issued as the '822 patent on January 25, 2005. Applicants filed continuation Application 10/993,477 as a division of the '613 Application on November 22, 2004.  The '477 Application issued as the asserted '763 patent on October 30, 2007.  On September 24, 2007, Applicant filed Application 11/860,378 as a division of the '477 Application.  The '377 Application was published on January 17, 2008 as Publication Number 2008/0014965, referenced in the Complaint.

**Unenforceability of the '611 Patent**

United States Patent No. 5,946,611 (the "'611 patent") is unenforceable due to inequitable conduct.  EMSAT engaged in a course of conduct designed to "forum shop" at the Patent Office by repeatedly filing applications with similar unsupportable claims directed to the provision of wireless Enhanced 911 ("E-911") services in an attempt to get a "friendly" examiner.   In three of the Dennison patent applications, the same examiner rejected claims directed to emergency services for inadequate written support in the specification.   In the application of the '611 Patent, applicants, the named inventors, or their agents substantively involved in the preparation or prosecution of the '611 patent (hereinafter "Applicants") tried a fourth time to patent a claim directed to emergency services and was able to do so only with a different examiner who was unaware of the prior rejections because Applicants had intentionally

hidden them from the examiner.  Such conduct is fraudulent and also constitutes inequitable conduct.

**Unenforceability of '822 and '763 Patents**

The remaining patents-in-suit, 'the '822 Patent and the '763 Patent, are also unenforceable under the doctrine of infectious unenforceability and are tainted by Applicants' fraud on the PTO.  *See Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223 (Fed. Cir. 2007); *see also Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240 (1933); *Precision Instrument Mfg. Co. v. Automotive Co.,* 324 U.S. 806 (1945).

The '822 patent issued on January 25, 2005, from U.S. Patent Application Serial No. 09/662,613 (the "'613 Application"), which was filed with the PTO on September 15, 2000.  The '613 Application is a continuation of Application 08/848,082, now U.S. Patent No. 6,324,404, which is a CIP of Application 08/554,884, now U.S. Patent No. 5,546,445.

The '763 Patent issued on October 30, 2007, from U.S. Patent Application No. 10/993,477 (the "'477 Application"), which was filed with the PTO on November 22, 2004.  The '477 Application is a divisional of the '613 Application.

**The PTO Rejects Applicants' Claim Directed to Emergencies in Reissue Application of the Ultimate Parent Application Under 35 U.S.C. § 112**

The '611 patent claims priority back to Application No. 07/813,494, which issued as United States patent 5,235,633.  The '633 patent was submitted for reissue on November 9, 1995, and assigned Application No. 08/552,486.  Application No. 08/552,486 was reissued as RE 35,916 on October 6, 1998.  Notwithstanding the reissue of the '633 patent, the '611 patent nevertheless claims priority to the filing date of the original 1991 application on which the '633 patent and the later reissued patent RE 35,916 were based.

Application No. 08/552,486 included claim 16, which read:

16.  The method defined in claim 11 further including a step of using said geographic location to control emergency calls.

In a declaration executed October 30, 1995, and submitted as part of the filing of the

reissue application, Applicants declared to the PTO that:

5. That I verily believe the original patent to be partly inoperative or invalid because of error without any deceptive intent on the part of the Applicant.

6. That I specifically aver an error in the claims of the original patent as declaimed as follows, … and claims 11 - 13 and 15 are in error in that they are over broad for not specifically providing that the method of making call management decisions in a cellular telephone system having a plurality of cell sites includes, among other steps, an additional step of using the geographic location of the mobile unit for taxing and billing purposes as set forth in column 2, line 65, column 3, lines 12-15, column 4, lines 9 et seq, column 6, line 10 and lines 38-40, **and for failing to claim the additional step of using the geographic location of the mobile unit to handle emergency calls as set forth in column 6, lines 54-56 and in Figure 11A.**

(emphasis added)

On September 9, 1996, the Examiner rejected '486 Application claim 16, stating:

Claim 16 is rejected under 35 U.S.C. § 112, first paragraph, as containing subject matter which was not described in the specification in such a way as to enable one skilled in the art to which it pertains, or with which it is most nearly connected, to make and/or use the invention.  Applicant claims the use of geographic location information to control emergency calls.  Applicants only mention of emergency, let alone emergency calls, is a statement at the very end of the specification which reads:

"The mobile locating features of the system could also be important in other contexts, **such as <u>emergencies</u> or the like**".

This statement is extremely broad.  One of ordinary skill in the art can not begin to determined [sic] the scope of this statement let alone derive support for the using the "geographic location information to control emergency calls".

Office Action (9/9/1996) at 2-3 (emphasis in original).

Applicants canceled claim 16 of Application No. 0/552,486 on January 22, 1997, stating

that "no further comments will be directed to Claim 16."

**The PTO Again Rejects Applicants' Claim Directed to Emergencies / Emergency Services Under 35 U.S.C. § 112 in the Application from Which the '611 Patent Depends**

Application No. 08/670,281, which issued as the '611 Patent, is a divisional of Application No. 08/555,884, which issued as the '445 Patent.

On October 23, 1995 and during prosecution of the '884 Application, Applicants sought to obtain claim 16, which read as follows:

> 16.     A method of making emergency call decisions in a cellular telephone system having a plurality of cell sites at various geographic locations and an MTSO comprising:
>
> A)     in a cellular system, placing a call requesting emergency assistance from a mobile unit;
> B)     determining an exact geographic location for the mobile unit requesting emergency assistance;
> C)     communicating the exact geographic location to an MTSO;  and
>
> D)     sending the exact geographic location of the mobile unit to an emergency service.

At the time of the filing of this amendment, Applicants stated "[i]t is noted that the limitations presented in the claims of this application are supported in the application as filed, *see, e.g.*, Figure 11 (as filed), lines 10-20 of page 8, lines 6-7 of page 5, lines 6 et seq of page 11, lines 12 et seq of page 12, lines 2-5 of page 12, and page 13, lines 15-19 (all as filed)."

On March 18, 1996, the PTO rejected claim 16 of the '884 Application under 35 U.S.C. § 112.  Examiner Bost stated that the only mention of "emergencies" in the specification was that "'[t]he mobile location feature of the system could be important in other contexts, such as emergencies or the like,'" and concluded that:

> The specification therefore clearly does not provide support for the claimed "…method of making emergency call decisions …sending the exact geographic location of the mobile unit to an emergency service."  Figure 11A, last block merely states "if 911 emergency call, send location to Bell Tel. Co." [see claim 16]."

Office Action (3/18/96) at 2 (emphasis in original).

The PTO also rejected claim 16 as obvious over the Nasco, Jr. reference under 35 U.S.C. § 103.

On April 25, 1996, Applicants canceled claim 16 of the '884 Application without prejudice and stated that "no further comments will be directed to the issues associated with Claim 16."

**The PTO Rejects Claim Directed to Emergencies in Related Application Under 35 U.S.C. § 112 for the Third Time**

Application No. 08/563,897, which ultimately issued as the '814 Patent, is a continuation of Application No. 08/402,976, which was abandoned.

In the '897 Application, after a series of file wrapper continuation applications, Applicants added new claims 9-12 on November 22, 1995. Claim 12 read:

> 12. The wireless radio communications system defined in Claim 8 further including means for notifying emergency equipment of the location of the mobile unit.

The Examiner rejected new claim 12 under 35 U.S.C. § 112, ¶ 1 on June 10, 1996. The Examiner stated that:

> The specification (which should be identical to the parent application, and its parent application) does not provide support for "The wireless radio communications system further including means for notifying emergency equipment of the location of the mobile unit". The specification merely teaches that if there is 911 call, the location of the mobile is sent to Bell Tel. Co.
>
> Office Action (6/10/1996) at 2.

Applicants amended claim 12 in a response dated August 7, 1996. The amendment removed the "notifying emergency equipment of" language and inserted new "call routing to provider service for the mobile unit based on" language.

**Applicants' Failure to Disclose the Rejections Under 35 U.S.C. § 112 from the Related Applications**

On June 21, 1996, Applicants filed the '281 Application, which issued as the '611 Patent, as a divisional application of Application No. 08/555,884, which issued as the '445 Patent.

The '281 Application was assigned to a different examiner, Edward F. Urban, than those before whom Applicants had prosecuted any of Application Nos. 08/555,884, 08/552,482, or 08/563,897.

Applicants presented a "Preliminary Amendment" that was received by the PTO on June 21, 1996, adding claim 16, which was identical to claim 16 rejected in the parent Application No. 08/555,884, and similar to claim 12, rejected in Application No. 08/563,897 and claim 16, rejected in Application No. 08/552,482.  Just nine days before applicants presented the "Preliminary Amendment," the Federal Communications Commission adopted an order mandating that all wireless carriers deploy enhanced 9-1-1 services.  FCC 96-264 (the "Initial E-911 Order").  This Preliminary Amendment was filed two years after the FCC had initiated a Rulemaking proceeding relating to the use of geographic location for E-911 services.

In the "Preliminary Amendment," Applicants did not disclose that the identical claim 16 had been rejected during prosecution of Application No. 08/555,884, that the FCC had initiated a Rulemaking on E-911, or that the FCC had adopted the "Initial E-911 Order."  Instead, Applicants stated in reference to a prior-art Japanese document that:  "Claim 16 which is directed to the user of geographic location to control emergency calls defines an invention that is neither disclosed nor suggested by the Japanese Document."

Applicants also presented a 'Preliminary Response" that was received by the PTO on June 21, 1996.  The "Preliminary Response" amended claim 16 as follows:

> 16 (Amended).        A method of making emergency call decisions in a cellular telephone system having a plurality of cell sites at various geographic locations and an MTSO comprising:

A) using a mobile unit of [in] a cellular system, placing a call requesting emergency assistance via the cellular system [from a mobile unit]'

B) determining an exact geographic location for the mobile unit requesting emergency assistance;

C) communicating the exact geographic location to an MTSO;  and

D) sending the exact geographic location of the mobile unit to an emergency service.

Office Action (6/21/1996) at 1.  (deletions in brackets, additions in underline)

In the "Preliminary Response," Applicants again did not disclose that during the prosecution of the parent application, the identical claim 16 had been rejected, that the FCC had proposed the use of geographic location information for E-911 services two years prior to the Preliminary Amendment, or that the FCC had adopted the Initial E-911 Order.   Instead, Applicants stated that:  "The references cited in the last Office Action of the parent application, Serial Number 08/555,884, filed on 10/23/95 [sic] dated 3/25/96, have been carefully reviewed. The Office Action rejects claim 16 presented therein as being unpatentable under 35 U.S.C. § 103, with Nasco, Jr. being cited in support of this conclusion."

Claim 16, after further amendment, eventually issued as claim 1 of the '611 patent. Claim 1 of the '611 patent reads:

1. A method of making emergency call decisions in a cellular telephone system having a plurality of cell sites at various geographic locations comprising:

A) providing a mobile unit which can be located at various and changeable geographic locations;

B) using the mobile unit to place a call requesting emergency service via a cellular telephone system;

C) determining the exact geographic location of the mobile unit placing the call requesting emergency service;

D)   storing geographic data associated with the cellular telephone system and which are required to complete the call requesting emergency service;

E)   comparing the exact geographic location of the mobile unit placing the call requesting emergency service to the stored geographic data; and

F)   automatically routing the mobile unit call requesting emergency service to an emergency service based on the comparison regardless of cell site location.

No mention was made by Applicants at any time during the prosecution of Application No. 08/670,281 of the prior rejections under 35 U.S.C. § 112 of: (a) claim 16 of the 08/555,884 application; (b) claim 16 of reissue Application No. 08/552,486; or (c) claim 12 of Application No. 08/563,897.

**Applicants' Failure to Disclose the FCC E-911 Rulemaking or Any of the Technical Papers and Comments Submitted to the FCC in Connection with Those Proceedings**

As alleged in greater detail in MetroPCS's Counterclaims below, the Federal Communications Commission initiated a Rulemaking proceeding in 1994 in which it sought comment on its contemplated rules to require wireless carriers to provide enhanced 911 emergency-call services to wireless users.  In connection with those proceedings, the FCC received and relied upon a number of submissions from individual wireless companies as well as wireless industry organizations representing wireless carriers that contained technical descriptions of the carriers' abilities to determine and provide geographic-location information to Public Safety Answering Points ("PSAPs") in connection with emergency calls.  Indeed, nine days before the submission of the Preliminary Amendment in the '281 Application, which issued as the '611 Patent, the FCC adopted the first order mandating E-911 for wireless carriers. The Initial E-911 Order was public information at the time applicants filed the Preliminary Amendment.  Although Applicants were aware of the ongoing FCC proceedings and the Initial

E-911 Order because, among other reasons, Applicants were employed by and were officers of an FCC-licensed wireless carrier subject to those proceedings and bound by the result thereof, at no time during the prosecution of the '611 patent or the related applications did Applicants disclose to the PTO that the FCC was engaged in Rulemaking proceedings relating to the subject of the pending application(s), nor did they disclose any of the prior art generated during or related to such proceedings.

### Applicants' Failures to Disclose (1) the Rejections Under 35 U.S.C. § 112 and (2) the FCC's E-911 Rulemaking and Related Prior Art Was Material and Intentional

The PTO's prior rejections under 35 U.S.C. § 112 were clearly material to the patentability of claim 1 of the '611 patent.

The FCC's E-911 Rulemaking, the Initial E-911 Order, and the technical papers and comments filed with the FCC in connection with those proceedings were likewise material to the patentability of claim 1 of the '611 patent.

Applicants' failures to disclose to the examiner the prior rejections of claims directed to emergency services in Application No. 08/670,281 under 35 U.S.C. § 112, the Initial E-911 Order, the FCC's E-911 Rulemaking and the prior art generated during those proceedings from 1994 through 1996 were done with an intent to mislead the PTO so as to induce issuance of claim 1 of the '611 patent, and were knowingly false.

### NINTH DEFENSE

(28 U.S.C. § 1498)

Plaintiffs' claims and prayer for relief in this action are barred, in whole or in part, by 28 U.S.C. § 1498.

### TENTH DEFENSE

(Lack of Subject Matter Jurisdiction)

This Court lacks subject matter jurisdiction because Plaintiffs' claims, as pleaded, must be brought exclusively in the United States Court of Federal Claims pursuant to 28 U.S.C. § 1498(a).

## ELEVENTH DEFENSE

(Patent Misuse)

Plaintiffs claims are barred, in whole or in part, by the doctrine of patent misuse.

## COUNTERCLAIMS

1. MetroPCS asserts the following counterclaims against Plaintiff/Counterclaim Defendant EMSAT and allege as follows on the basis of personal knowledge and/or information and belief:

2. As alleged herein, EMSAT has engaged in an illegal strategy to acquire and maintain a monopoly over E-911 emergency services, as defined below, for the purposes of extorting royalties from wireless carriers who are required to provide E-911 services by government mandate.

3. To further its scheme, EMSAT, or its predecessors, made fraudulent misrepresentations to the Patent and Trademark Office during the prosecution of the '611 Patent. But for this fraud on the PTO, the '611 Patent would not have issued.

4. EMSAT then engaged in a corrupt effort to assert its unenforceable patent and to extort monopoly rents from wireless carriers and others who had no choice but to adhere to the FCC's E-911 regulations.

5. EMSAT has brought suit in bad faith, alleging infringement of the '611 patent by the top six facilities-based carriers in the United States, which collectively serve hundreds of millions of wireless customers.

6.      By virtue of such conduct, EMSAT has caused substantial injury to the market as a whole and to MetroPCS and consumers who make 911 calls from wireless telephones.


## PARTIES

7.      On information and belief, and based on its allegations in its Complaint, EMSAT is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business located at 101 Southbend Court, Loveland, Ohio.

8.      On information and belief, LBS is a limited liability company organized under the laws of the state of Delaware with its principal place of business located at 500 Newport Center Drive, Newport Beach, California.

9.      Wireless is a Delaware corporation with its principal place of business at 2250 Lakeside Boulevard, Richardson, Texas 75082.

10.     Communications is a Delaware corporation with its principal place of business at 2250 Lakeside Boulevard, Richardson, Texas 75082.


## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201-2202, 1331, 1337, and 1338.  A real, immediate, and justiciable controversy exists between MetroPCS and EMSAT.  The controversy relates to the non-infringement and invalidity of US Patent Nos. 5,946,611 ("'611 Patent"); 6,324,404 ("'404 Patent"); 6,847,822 ("'822 Patent"); and 7,289,763("'763 Patent").  EMSAT has alleged that MetroPCS infringes these patents.  The Court also has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and

26.  This Court additionally has supplemental subject-matter jurisdiction over MetroPCS' state-law claims pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367 because these claims are so related to the federal claims that they form part of the same case or controversy.

12.    EMSAT is subject to personal jurisdiction and venue in the Eastern District of Texas by virtue of its contacts with the State of Texas and this District in particular.  As the Plaintiff in this case, EMSAT has consented to, and invoked the jurisdiction and venue of, this Court.

13.    The Eastern District of Texas is the proper venue for MetroPCS' declaratory-judgment claims under 28 U.S.C. §§ 1391(b) and (c) and 1400(b).  As the Plaintiff in this action, EMSAT has consented to this judicial district being the proper venue for MetroPCS' declaratory-judgment claims.

## FACTS COMMON TO ALL CLAIMS

I.    **MetroPCS**

14.    MetroPCS, by and through its affiliates and subsidiaries, provides wireless broadband mobile services on a flat-rate, unlimited, no-signed-contract basis to approximately 6.1 million subscribers as of March 31, 2009.

15.    MetroPCS, by and through its affiliates and subsidiaries, provides its wireless broadband mobile services for a monthly service fee starting at $30 per month.

16.    MetroPCS, by and through its affiliates and subsidiaries, provides its wireless broadband mobile services to a mass market, which is largely underserved by the large national carriers.

17.    MetroPCS, by and through its affiliates and subsidiaries, provides service in a number of major metropolitan areas across the United States, including in the greater Dallas-Fort

Worth metropolitan area of Texas, the San Francisco and Sacramento metropolitan areas of California, the greater Miami metropolitan area of Florida, and the New York City metropolitan area.

18.     As required under Federal Communication Commission rules, MetroPCS provides E-911 services to its customers and provides Phase II E-911 services in areas where the local PSAP has requested Phase II E-911, including communities within Texas, California, New York, Massachusetts, and Florida.

## II.     THE TECHNOLOGY

### Brief History of 911

19.     The origin of 911 dates back to 1957, when the National Association for Fire Chiefs recommended using a single telephone number to report fires.  Ten years later, in 1967, the President's Commission on Law Enforcement and Administration of Justice recommended that a single number should be established nationwide to handle emergency situations.

20.     In March of 1973, the White House issued National Policy bulletin Number 73-1, which recognized the benefits of the 911 system and encouraged nationwide adoption.  By the end of 1976, only 17% of the U.S. population was being served by 911.  Today, by contrast, 99% of the population of the U.S. is covered by at least basic 911 services.

### How 911 Works

21.     Traditionally, when a 911 call was made, it was routed from a local exchange carrier to a PSAP.  The PSAP operator who received the call would then gather information regarding the nature and location of the emergency by asking the caller questions.  This was problematic because the operator had no way of calling back should the call disconnect before this information was ascertained.

22.     Emergency systems were then upgraded to what has been termed Enhanced 911 or E-911.  When a 911 call is made in a wireline[2] system with E-911 capabilities, the local exchange carrier selects the PSAP closest to the caller's location based on customer-location information stored in a database maintained by the local exchange carrier.  Additionally, the database allows the caller's telephone number, address, and other useful information to be automatically transmitted to the PSAP.  Since wireline numbers are associated with a specific address, the local exchange carrier was able to use a database to ascertain the calling party's location.

23.     Enhanced 911 saves lives by allowing emergency services personnel to perform their jobs more quickly and efficiently.  Namely, by eliminating the need for a human operator to gather information from the caller—who is often not completely rational—emergency assistance can be dispatched faster.

**FCC's Proposed Rulemaking**

24.     By 1994, the U.S. had in excess of 33 million cellular subscribers, who accounted for almost 18 million 911 calls (approximately 19% of all calls to 911).  At that time, wireless carriers only provided basic 911 services.  The mobility of wireless callers presented difficulties when trying to route the call to the most appropriate PSAP and to locate the caller in case location information was not obtained from the caller because a cellular phone is not at a fixed location.  To extend the life-saving features of E-911 services to the rapidly growing number of cellular phone users, the FCC opened a Rulemaking proceeding in the fall of 1994.

---

[2] "Wireline" refers to a phone that is connected to the operating switch over a land line, like a regular home phone.

25.     After nearly two years of work in collaboration with industry participants, the FCC adopted an Order mandating wireless E-911 services on June 12, 1996, *nine days before* Plaintiffs filed the Preliminary Amendment.  911 Services, 47 C.F.R. § 20.18 (2008).  Phase I of the final rules required, by April 1, 1998, all wireless carriers to provide the telephone number of the wireless caller and the location of the cell tower or base station receiving a 911 call to the appropriate PSAP.  *Id.* § 20.18(d).  Phase II requires the wireless carriers to provide even more precise location information—specifically, latitude and longitude of the caller's location—to the PSAP upon the PSAP's request.  *Id.* § 20.18(e).  Phase II also calls for an even higher level of precision in the location information that has to be provided to the PSAPs, which must be implemented by September 11, 2012.  *Id.* § 20.18(h).

## II.     THE RELEVANT MARKETS

### Product Market

26.     An estimated 240 million calls are made to 911 each year in the United States.  The FCC estimates that a third of these 911 calls are made on wireless phones.  Because of the high volume of emergency calls made from wireless phones, the FCC adopted new rules on June 12, 1996, just nine days before Plaintiffs filed the Preliminary Amendment, requiring wireless carriers to automatically provide location information of wireless callers to the PSAPs (Phase I).  Phase II further required FCC licensees to provide to the PSAP "the location of all 911 calls by longitude and latitude," subject to various accuracy requirements.  *Id.* § 20.18(e).

27.     The relevant product market distorted by EMSAT's anticompetitive conduct consists of the method or technology to provide location information to PSAPs in compliance with Phase II of the FCC's rules regarding E-911.

28.     Under EMSAT's construction of the scope of the illegally obtained patent rights, there are no available substitutes in the relevant market.  In other words, if EMSAT's allegations

regarding the scope of its patent coverage, as described herein, are correct, there are no alternative methods of complying with the FCC's wireless Phase II E-911 regulations that a wireless carrier can invoke to avoid the '611 Patent, and EMSAT thus has monopoly power.

**The Relevant Geographic Markets**

29.     The relevant geographic market for this technology is the United States of America because all wireless carriers in the United States are required to comply with the FCC's Phase II E-911 regulations.

**EMSAT's Monopoly Power**

30.     EMSAT claims that all wireless carriers that comply with Phase II of the FCC's mandatory E-911 regulations infringe one or more of the patents-in-suit.  As described below, EMSAT has brought in bad faith numerous enforcement suits against providers of wireless services in the U.S.

31.     EMSAT brought five separate enforcement suits in the Northern District of Ohio on March 31, 2008 against, collectively, Alltel Corp., AT&T Mobility LLC, Cellco Partnership d/b/a Verizon Wireless, Sprint Spectrum LP, Sprint Communications Company L.P., Nextel Operations, Inc., Nextel West Corp., Nextel of California, Inc., Nextel Communications of the Mid-Atlantic, Inc., Nextel of New York, Inc., Nextel of South Corp., Nextel of Texas, Inc., Boost Mobile LLC, Boost Worldwide, Inc., and T-Mobile USA, Inc in the Northern District of Ohio. *See* Complaint for Patent Infringement, *EMSAT Advanced Geo-Location Tech., LLC v. Cellco Partnership*, No. 4:08 CV 00816, (N.D. Ohio March 31, 2008); *EMSAT Advanced Geo-Location Tech., LLC v. T-Mobile USA, Inc.*, No. 4:08 CV 00817, (N.D. Ohio March 31, 2008); Complaint for Patent Infringement, *EMSAT Advanced Geo-Location Tech., LLC v. Sprint Spectrum LP*, No. 4:08 CV 00818, (N.D. Ohio March 31, 2008); Complaint for Patent Infringement, *EMSAT*

*Advanced Geo-Location Tech., LLC v. Alltel Corp.*, No. 4:08 CV 00821, (N.D. Ohio March 31, 2008); *EMSAT Advanced Geo-Location Tech., LLC v. AT&T Mobility LLC*, No. 4:08 CV 00822, (N.D. Ohio March 31, 2008).  In these suits, EMSAT asserts that all the wireless-carrier defendants infringe the patents-in-suit, including the '611 patent, as a result of their provision of Phase II E-911 services to their wireless customers in compliance with the federally mandated regulations described above.  *Id.* at ¶ 15.  As a result of these suits, Google has filed a claim for declaratory relief that its Google Maps product does not infringe claims 23, 26, 28, 31, and 32 of the '763 Patent and that those claims are invalid.  Complaint for Declaratory Relief, *Google, Inc. v. EMSAT Advanced Geo-Location Tech., LLC*, No. 4:2009 CV 01243 (N.D. Ohio May 29, 2009).

32.     EMSAT brought an additional enforcement action against MetroPCS Communications, Inc., MetroPCS Wireless, Inc., Centennial Communications Corp., Leap Wireless International, Inc., Cricket Communications, Inc., ETEX telephone Cooperative Inc., and ETEX Communications, L.P. in the Eastern District of Texas on October 7, 2008.  This action likewise alleges infringement by all defendants of the patents-in-suit, including the '611 Patent, as a result of their provision of Phase II E-911 service in compliance with the FCC mandate.  Upon information and belief, as a result of this action, Cricket Communications, Inc. has entered into a licensing agreement with EMSAT for the patents-in-suit.

33.     Another complaint was filed by EMSAT on January 27, 2009, this time in the Northern District of West Virginia.  This complaint named United States Cellular Corp and also alleges that the wireless-carrier defendant infringes the patents-in-suit, including the '611 Patent, as a result of its compliance with Phase II E-911 requirements.

34.     And most recently, EMSAT filed suit, again in the Eastern District of Texas, on April 1, 2009.  In this suit, EMSAT named Virgin Mobile USA, L.P., 7-Eleven, Inc., MGA Entertainment, Inc., Circle K Stores, Inc., GreatCall, Inc., Kajeet, Inc., TracFone Wireless, Inc., Ace Cash Express, Inc., and Ztar Mobile, Inc. as defendants.  As it has done in the seven prior complaints identified above, EMSAT alleges infringement by all defendants of the patents-in-suit, including the '611 Patent, as a result of their provision of Phase II E-911 service in compliance with the FCC regulations

35.     Because EMSAT alleges that *any* wireless carrier in compliance with the FCC's Phase II E-911 requirements infringes the Patents-in-suit, EMSAT's enforcement of its illegally obtained patents would allow it to collect a monopoly fee from the entire wireless industry for compliance with government mandates.  Such monopoly fees would be unavoidable because the compliance with the FCC's wireless Phase II E-911 regulations is mandatory, and covered carriers thus have no ability to "invent around" the asserted patent claims.  Thus, carriers would be forced to accede to EMSAT's royalty demands, no matter what royalty is requested, or service would be denied to customers.  Since wireless is becoming in many ways a substitute for wireline services, a lack of E-911 capability would severely diminish the ability of emergency personnel to respond.  Under EMSAT's construction of the scope of its illegally obtained patent rights, EMSAT has the power to set the price of compliance with the FCC's Phase II E-911 rules.  As described below, EMSAT achieved this position and the monopoly power attendant to it unlawfully.  Further, because EMSAT brought each of these suits with the knowledge that its patents are unenforceable, all of EMSAT's enforcement suits have been brought in bad faith and represent actionable marketplace misconduct.

III.     EMSAT'S ANTICOMPETITIVE, UNLAWFUL, AND UNFAIR CONDUCT

**EMSAT Files Its Original Patent Application Directed To a Solution for "False Roaming."**

36.    On December 26, 1991, U.S. Patent Application Serial No. 07/813,494 was filed by Terry M. Gernstein, the prosecuting attorney, on behalf of the named inventors—employees of EMSAT's predecessor, an Ohio cellular company named Sygnet Wireless.[3] This application—which would issue as U.S. Patent No. 5,235,633 (the "'633 Patent") on August 10, 1993—is the parent of all the patents at issue in this suit, and the application from which all claims asserted against E-911 in this litigation claim priority.

37.    The process claimed in the '633 Patent was developed to solve a business problem that was costing Sygnet Wireless revenue.  Plaintiffs' Opening Claim Construction Brief at 1, *EMSAT Advanced Geo-Location Tech., LLC v. Cellco Partnership*, Nos. 08-00816, 08-00816, 08-00821 (N.D. Ohio March 20, 2009) (attached as Ex. [ ]).  Sygnet Wireless's problem was that in uneven terrain, a subscriber's cell phone would on occasion connect to a wireless-communications station ("base station") that was located further away from (but in line of sight with) the caller, instead of the base station that was immediately adjacent to the caller's geographic location, because of the stronger signal strength received from the former.  U.S. Patent No. 5,235,633 col. 2 l. 59-66.  55-67.  Where the further line-of-sight station was operated by an adjacent carrier, the subscriber was not considered in Sygnet Wireless's "home" coverage area for purposes of the call, but rather the call was considered to be in a "visited" coverage area (also known as "roaming"), despite being geographically situated in Sygnet Wireless's "home" area.  This resulted in a loss of revenue to Sygnet Wireless because the revenue generated by a

---

[3] Sygnet Wireless, Inc. was a privately held cellular telecommunications carrier headquartered in Canfield, Ohio, which served 2.4 million customers in 1998 and held cellular licenses issued by the FCC for markets located in the Ohio, Pennsylvania, and New York.

subscriber's calls from a "visited" area was split between the "home" and "visited" carriers via roaming agreements. *Id.* Thus Sygnet Wireless's management sought a solution to this "false roaming" problem. *Id.* The end result of that effort was the '494 patent application that was filed in 1991 (which ultimately issued as the '633 Patent).

38.     The '494 Application claimed a method of ascertaining the exact geographic position of a cell phone placing a wireless call so that the cell phone could be matched up with the nearest base station. U.S. Patent No. 5,235,633 col. 6 l. 62-68, col. 7 l. 1-19. This meant that instead of signal strength being used to determine what base station serviced a call, geographic location became the determining factor. *Id.* This allowed Sygnet Wireless to force calls that were geographically within its "home" area to connect to its base stations rather than its competitors'. It is therefore not surprising that nothing in the 1991 '494 Application described or revealed enhanced 911 emergency services.

**The FCC, in Collaboration with Industry, Initiated Wireless E-911 Rulemaking Proceedings**

39.     On October 19, 1994, the FCC released its Notice of Proposed Rulemaking, which proposed a revision to the Commission's rules that would ensure the compatibility of wireless carriers with Enhanced 911 emergency-calling services.   [Notice of Proposed Rulemaking 10/19/94]   This proposed Rulemaking was inspired, at least in part, by an "Emergency Access Position Paper" that was submitted by the Associated Public Safety Communications Officials-International, Inc. ("APCO"), the National Emergency Number Association ("NENA"), the National Association of State Nine One One Administrators (NASNA), and the Personal Communications Industry Association ("PCIA"). *Id.* at ¶ 2. PCIA represented the wireless carriers, while the other three groups represented public-safety officers. The FCC relied heavily upon industry input, and based most of its proposals on the Joint Paper.

*Id.* at ¶ 36. On information and belief, Sygnet Wireless was aware of the Rulemaking at the FCC because it held licenses issued by the FCC and was required to comply with the FCC's rule.

40.     A few weeks later, on November 2, 1994, the FCC issued its proposed rules for wireless E-911. These rules required, among other things, that wireless carriers be able to provide PSAPs with geographic location information of 911 callers. [Proposed Rules 59 F.R. 54878 (November 2, 1994).] The FCC specifically sought comment on the technical and cost considerations that would be involved in implementing its proposed rules. *Id.* at 54879. On June 12, 1996, just nine days before Plaintiff's filed the Preliminary Amendment, the FCC adopted the Initial E-911 Order mandating the provision of geographic location information for E-911 calls.

41.     Apparently in recognition of the nearly unanimous desires of industry commenters, the FCC explicitly left it for the telecommunications industry to develop the technical standards required to implement Phase II of the wireless E-911 regulations. [NPRM 10/19/94 at ¶ 33-36.]. Indeed, most of the FCC's E-911 proposals and the ensuing regulations were based on input from members of the telecommunications industry, and especially from organizations representing wireless carriers on the one hand (such as TIA, CTIA, and PCIA), and public-safety organizations on the other (such as NENA and APCO). For instance, the regulatory history of the FCC's wireless E-911 requirements demonstrates that two *ex parte* submissions from a combination of these industry groups—an "Emergency Access Position Paper" and a Consensus Agreement—were particularly instrumental in shaping the FCC's wireless E-911 policy. *Id.* at ¶ 36 ("We are basing most of our proposals on the [Emergency Access Position Paper]."). The FCC also considered reports prepared at two Joint "Experts Meetings" that were

held in August of 1994, under the auspices of the Telecommunications Industry Association TR45 Committee, and in October of 1994, under the auspices of the PCIA.  *Id.* at ¶ 48.

**EMSAT Exploits the Developing FCC Regulations**

42.     On October 23, 1995, nearly a year after the FCC released its Notice of Proposed Rulemaking contemplating the use of geographic location information in the provision of emergency services,[4] EMSAT filed Application No. 08/555,884 (the '884 Application"), which claimed its priority date from the 1991 '494 parent application.[5]  This was the first of three patent applications filed within a one-month period, following a nearly two-year lull in activity related to the '633 Patent family.  The application was assigned to the same examiner as the 1991 application.  During the prosecution, EMSAT amended the '884 Application to include a claim that tracked the requirements that the FCC had recently proposed to be included in its then-developing wireless E-911 regulations.   Specifically, EMSAT sought a claim directed to providing location data to a PSAP in connection with handing off a call requesting emergency services, which read:

> 16.  **A method of making emergency call decisions** in a cellular telephone system having a plurality of cell sites at various geographic locations and an MTSO comprising:
>
> A)  in a cellular system, **placing a call requesting emergency assistance** from a mobile unit;
>
> B)   determining an exact geographic location for the mobile unit **requesting emergency assistance**;
>
> C)  communicating the exact geographic location to an MTSO; and

---

[4] On information and belief, EMSAT was aware of the FCC's E-911 requirements, since it held FCC licenses and was required to comply with FCC rules.

[5] For ease of reference, this pleading refers to "EMSAT's" activities before the PTO, when in fact the patents-in-suit were assigned in the first instance to Sygnet Wireless, EMSAT's predecessor in interest.

D)  **sending the exact geographic location of the mobile unit to an emergency service**.

43.     A few weeks later, on November 9, 1995, EMSAT filed a second application, Application No. 552,486 ('486 Application), which sought a reissue of the '633 patent.  As with the other application, EMSAT again included a claim tracking the developing E-911 requirements, which read:

16. The method defined in Claim 11 further including a step of using said geographic location **to control emergency calls**.

44.     Finally, on November 22, 1995, EMSAT filed  Application No. 08/563,897 ("'897 Application"), just a few days after the '486 Application.  EMSAT yet again included a claim directed to the developing E-911 requirements for wireless carriers, which read:

12.     The wireless radio communications system defined in Claim 8 further including **means for notifying emergency equipment of the location of the mobile unit**.

45.     EMSAT never disclosed to the PTO during the prosecution of the '611 patent or any of the related applications the FCC's rulemaking, the Initial E-911 Order, or the technical papers submitted by the various industry organizations and other commenters to the FCC proceedings, which contained proposals for technical standards to implement the FCC's contemplated requirements.

**EMSAT's Anticompetitive Efforts To Patent the Developing Wireless E-911 Regulations Are Repeatedly Thwarted by the PTO.**

46.     In an office action mailed on March 25, 1996, the PTO officially rejected Claim 16 of the '884 Application for two independent reasons.  First, the claim was rejected under 35 U.S.C. § 112 because "the specification as originally filed[] does not provide support for the invention now claimed."  Specifically, the examiner concluded that the 1991 parent application,

from which the '884 Application claimed priority (and *had to* in order avoid the FCC regulations as invalidating prior art), did not support the new emergency-services claim. Claim 16 was also rejected under 35 U.S.C. § 103 because it was obvious in light of the prior art. In response to the rejection, EMSAT canceled Claim 16 without prejudice, stating that "no further comments will be directed to the issues associated with Claim 16." After the wireless E-911 claim was removed, the '884 Application issued as U.S. Patent No. 5,546,445 on August 13, 1996.

47.     Likewise, on June 10, 1996, the PTO rejected Claim 12 of the '897 Application—another attempt by EMSAT to obtain claims directed to the provision of wireless Phase II E-911 services—under 35 U.S.C. § 112. Once again, the office action rejecting the emergency-services claim stated that the specification of the parent application did not provide support for such claims. Rather than contest this finding or inform the Patent Office that the FCC had adopted the Initial E-911 Order, EMSAT chose to amend Claim 12 on August 7, 1996 by replacing the language "notifying emergency equipment of," with "call routing to provide proper service for the mobile unit based on . . ." With the emergency-services language once again removed entirely, the '897 Application issued as U.S. Patent No. 5,815,814 on September 29, 1998.

**After Two Sequential Rejections, and Even in Light of a Third Rejection, EMSAT Resorts To Fraud To Obtain the Claims It Now Asserts Against the Industry.**

48.     Determined to capitalize on the Rulemaking proceedings underway at the FCC, EMSAT gambled that another application might be handled by a different examiner and filed Application No. 08/670,281 (the '281 Application) as a divisional of the '884 Application on June 21, 1996, nine days after EMSAT was aware that the FCC had adopted the Initial E-911 Order mandating the use of geographic information for E-911 calls. EMSAT's gamble worked. Unlike the prior three applications (two of which had already yielded office actions rejecting the emergency-services claims for inadequate written description), the '884 Application was

assigned to a different examiner unfamiliar with the history of the Dennison family of patents. Without telling the examiner that the emergency-services claims had already been twice rejected or that the FCC had already adopted the Initial E-911 Order, EMSAT added the same claim to the '884 Application that was rejected in the prior application.

49.     Despite an affirmative duty to do so, EMSAT never disclosed that an identically worded claim in a sibling application (the '884 Application) had been rejected, and that a substantially similar claim in another sibling application was likewise rejected for the very same reason—lack of support in the specification of the 1991 parent application for claims directed to emergency services—or that the FCC had already adopted the Initial E-911 Order.  These were material facts that the examiners needed to know.  EMSAT knew of the prior rejections and that the FCC had already adopted the Initial E-911 Order and intentionally failed to disclose them to the examiner, which was particularly misleading in light of what *was* disclosed by EMSAT during the prosecution of the '611 Patent—a portion of an office action addressing solely the basis for the prior examiner's obviousness rejections of the emergency-services claims under § 103, but curiously failing to include the remainder of the office action addressing the § 112 rejection.

50.     EMSAT at no time disclosed during the prosecution of the '611 Patent (or of any of the related applications that claimed priority to the original 1991 filing) the two prior rejections under 35 U.S.C. § 112 of EMSAT's efforts to obtain emergency-services claims— claim 16 of the '884 application and claim 12 of the '897 Application—or the adoption of the Initial E-911 Order *before* the filing of amendment adding claim 16.

51.     While the application of the '611 Patent was still pending, the PTO rejected the third attempt by the patentee in another related application to claim an emergency service. As

had been done twice before, the examiner rejected the claim under 35 U.S.C. § 112 for inadequate written description.  EMSAT cancelled the rejected claim, and the application issued as U.S. Patent No. RE 35,916.

52.     Even after receiving this *third* sequential rejection of its efforts to obtain emergency-services claims based on the 1991 parent application, EMSAT still did not disclose to the examiner reviewing the application that led to the '611 Patent that such claims had ever been rejected based on the lack of an adequate disclosure in the specification.  Even when EMSAT responded to an office action rejecting the emergency-services claim (claim 16) of the '281 Application under § 103 in November 1998, EMSAT intentionally and knowingly maintained its misleading silence regarding the now *three* prior office actions in contravention of its statutory duty to speak.

53.     Misled by EMSAT's omissions and half-truths, the new examiner, reasonably relying on EMSAT's representations, issued U.S. Patent No. 5,946,611 on August 11, 1999, and its claims are now asserted against an entire industry in this and other lawsuits.  The examiner reviewed the application that led to the '611 Patent without crucial information—that similar claims directed to emergency services had been rejected three times before, and that the FCC had mandated the use of geographic information in connection with E-911 calls prior to the filing of the amendment adding claim 16.  Given the limited resources and time an examiner has to examine each application, an examiner is unlikely to be aware of relevant information in related applications unless the patentee brings such information to the examiner's attention.  The examiner therefore relies on the patentee to disclose important information, since the patentee is uniquely situated in that it knows of all the prior information in related applications.  Indeed, the PTO has made this clear by imposing on the patentee an affirmative duty to disclose to the

examiner any material information, be it public or nonpublic, precisely to aid the examination process and to apprise the examiner of information that he otherwise may not be aware of. Here the patentee had the crucial information that different examiners had rejected similar claims three times before and that the FCC had adopted the Initial E-911 Order before the filing of the amendment adding claim 16, but chose not to submit it to this examiner, and further obscured the truth with a misleading half-truth. Therefore, the examiner allowed the claims based on an incomplete record and a material omission. Had the patentee disclosed such information, the examiner would not have allowed an invalid claim.

**Intentional Non-disclosures Constitute Fraud on the PTO.**

54.    EMSAT's failure to disclose to the PTO the three prior rejections of its nearly identical attempts to cover the FCC's developing wireless E-911 requirements and that the FCC had adopted the Initial E-911 Order before the filing of the amendment adding claim 16 violated its duty of "candor and good faith" to the PTO. 37 C.F.R. § 156(a) (2008). This duty includes a duty to disclose adverse decisions in related, co-pending applications and known prior art. Further, on information and belief, but for EMSAT's lack of disclosures and misleading disclosure of half-truths regarding the prior rejections, the '611 Patent would not have issued in its current form. Indeed, statements by the PTO in recent orders denying *ex parte* requests for reexamination of the related '763 and '822 patents demonstrate that, because of the lack of disclosure to support such claims in the 1991 parent specification, the '611 Patent would not have issued with claims directed to emergency services had it not been for EMSAT's failure to disclose and misleading half disclosures. Specifically, the examiner noted in the office action denying the request for reexamination of the '763 patent that:

> It is noted that **a specific type of call routing in the instance of an emergency call is not sufficiently supported by the parent disclosures**; that is to say any

decision of which emergency call center to send a call to based on location is not fully supported as the specifications of the 5,235,633 Patent and the 5,546,445 Patent both fail to describe matching such data in the case of the emergency call and no specific steps are described with regards to routing such a call to a call center, rather FIG 11A merely states that the user location is forwarded to the Bell telephone system in such a call.

Order Denying Request for Ex Parte Reexamination of '763 Patent (June 5, 2009) at 8 (emphasis added).  Likewise, the examiner stated in the '822 office action that:

It is noted that billing and taxing may be construed as such a location-based service as claimed, however **another service such as an emergency call would not be properly supported by the earlier disclosure** as the specifications of the 5,235,633 Patent and the 5,546,445 Patent both fail to describe comparing such data in the case of the emergency call. No specific steps are described with regards to routing such a call, rather FIG 11A merely states that the user location is forwarded to the Bell telephone system in such a call.

Order Denying Request for Ex Parte Reexamination of '822 Patent (June 5, 2009) at 10 (emphasis added).  The written description of the '633 parent application, upon which the claims of the '611 patent are based on and to which they claim priority, is the "parent disclosure[ ]" and the "earlier disclosure[ ]" referred to by the examiner in these orders.

### The Dennison Family of Patents Are Carved out of the Sale of Sygnet Wireless To AT&T's Predecessor, and Are Ultimately Assigned To EMSAT.

55.    On June 4, 1998, likely in recognition of the patents potential future value, Sygnet Wireless—a company wholly owned by some of the named Inventors—sold the '633 patent and all future patents to Sycord Limited Partnership—a company also wholly owned by some of the Inventors and, upon information and belief, created for the sole purpose of holding the patents-in-suit—for $300,000.

56.    A month later, Dobson Communications Corporation bought Sygnet Wireless for $227.5 million and merged it with its affiliate, Front Nine Company.  Eventually, the resulting

entity, called Sygnet Wireless, was merged into Dobson.  Then, on June 19, 2007, Dobson merged with AT&T.

57.     On May 10, 2007, Sycord Limited Partnership assigned the patents-in-suit to EMSAT for $10.  EMSAT is a single-member limited liability company whose sole managing member is Sycord.

## COUNT I: VIOLATION OF SHERMAN ACT § 2
### (*WALKER PROCESS* MONOPOLIZATION)

58.     MetroPCS repeats and incorporates by reference the allegations of paragraphs 1 – 58, as though fully set forth herein.

59.     EMSAT knowingly and intentionally failed to disclose material information to the PTO and made material misrepresentations and misleading half-truths in prosecuting the applications leading to the '611 Patent.  The Examiner reasonably relied on the statements and omissions by EMSAT.   But for such knowing and intentional fraudulent omissions and misrepresentations, upon information and belief, the PTO would not have issued the '611 Patent, but rather would have rejected any claims directed to emergency services and, in particular, to the provision of wireless Phase II E-911 services.

60.     EMSAT has asserted the '611 Patent against MetroPCS with the knowledge that the '611 Patent was obtained by fraud and is thus invalid and unenforceable.

61.     EMSAT is knowingly asserting this fraudulently obtained and invalid patent against MetroPCS as part of a scheme to monopolize the market for wireless E-911.

62.     EMSAT has obtained monopoly power in the relevant market by fraud on the patent office, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

63.     EMSAT's monopoly power in the relevant market, obtained by fraud, has caused or threatened to cause injury to the business or property of MetroPCS in the form of monopoly royalty rents that have been collected or which EMSAT seeks to collect from wireless carriers, including MetroPCS.  Such monopoly rents and the tax they impose on wireless carries also cause injury to consumers of wireless services in the U.S.  Moreover, MetroPCS and other wireless carriers have been injured in their business and/or property by being forced to incur legal fees, expenses, and related costs to defend the charges of patent infringement made here.

64.     All of these actions have been carried out by EMSAT for the purpose and with the effect of obtaining and maintaining monopoly power in the relevant market and to unlawfully extract monopoly rents and to exclude competition from the relevant market in violation of the Sherman Act, 15 U.S.C. § 2.

## COUNT II: PUBLIC NUISANCE

65.     MetroPCS repeats and incorporates by reference the allegations of paragraphs 1 - 65, as though fully set forth herein.

66.     MetroPCS is a private entity which has common-law standing to sue because it has suffered a pecuniary harm that is different in kind from that suffered by the general public. Specifically, MetroPCS has been burdened with the cost of litigating the patent-infringement claims brought by EMSAT, as well as the cost of its litigation with TeleCommunication Systems ("TCS") over an indemnification agreement relating to TCS's provision of Phase II E-911 geo-location services to MetroPCS.  Further, this has harmed MetroPCS's ongoing and otherwise friendly relationship with TCS.

67.     EMSAT's conduct as alleged herein has resulted in an unreasonable interference with the availability of E-911 emergency services to the public.  In particular, EMSAT's enforcement action has increased the cost of providing wireless E-911 services to the general

public and is also acting as an impediment to innovation in our nation's emergency response and disaster preparedness system.

68.     Accordingly, MetroPCS is seeking actual damages, exemplary damages, and injunctive relief to prevent EMSAT from enforcing the patents-in-suit against parties who comply with the FCC's E-911 regulations.

**COUNT III: UNFAIR COMPETITION UNDER
CAL. BUS. & PROF. CODE § 17200 *ET SEQ.***

69.     MetroPCS repeats and incorporates by reference the allegations of paragraphs 1 – 69, as though fully set forth herein.

70.     MetroPCS asserts this claim of unfair competition under Cal. Bus. & Prof. Code § 17200 *et seq.* in its own name only and does not act for the interest of any other person or entity or for the general public.  MetroPCS has suffered injury in fact as a result of EMSAT's unfair business practices.

71.     California Business and Professions Code § 17203 provides that any court of competent jurisdiction may enjoin any person from engaging in unfair competition and restore to any person who is a victim of that unfair competition any money acquired thereby.

72.     EMSAT and MetroPCS are both persons within the meaning of § 17203.

73.     California Business and Professions Code § 17200 defines unfair competition to include "any unlawful, unfair or fraudulent business act or practice."

74.     EMSAT's unfair conduct comprises fraud and a violation of an antitrust law, violates the policy or spirit of one or more of these laws because its effects are comparable to or the same as a violation of the law, and otherwise significantly threatens or harms competition.

75.     EMSAT's conduct amounts to a fraudulent business act or practice under Cal. Bus. & Prof. Code § 17200 *et seq.* by creating a likelihood that MetroPCS and the public would

be misled as to the scope and validity of EMSAT's patents.  EMSAT's conduct is also unfair because it is substantially injurious to consumers.  EMSAT's conduct also constitutes a fraud against the PTO, which is unlawful under 37 C.F.R. § 1.56.

76.     Because EMSAT's enforcement action against MetroPCS was brought with knowledge that EMSAT's patents are unenforceable, EMSAT has committed bad-faith misconduct in the marketplace.

77.     EMSAT's above-described conduct amounts to an unlawful business act or practice under Cal. Bus. & Prof. Code § 17200 *et seq.* based on restraint of trade and monopolization and attempted monopolization in violation of 15 U.S.C. § 2.

78.     As a result of EMSAT's unfair competition, MetroPCS and the public will be damaged.  MetroPCS seeks an injunction and other equitable relief preventing further harm to itself and the public, and preventing EMSAT from continuing its unlawful, harmful, and anticompetitive conduct.  MetroPCS further seeks restitution of all damages that it has suffered as a result of EMSAT's wrongful conduct.

## COUNT IV: UNFAIR COMPETITION UNDER FLORIDA STATUTE § 501.201 *ET SEQ.*

79.     MetroPCS repeats and incorporates by reference the allegations of paragraphs 1-79, as though fully set forth herein.

80.     The Florida Deceptive & Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.204, makes it unlawful to use or employ "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

81.     MetroPCS is a consumer within the meaning of the FDUTPA, Fla. Stat. § 501.203(7).

82.     EMSAT's above-described conduct amounts to an unfair business act or practice under Fla. Stat. § 501.203(3) based on restraint of trade and monopolization and attempted monopolization in violation of 15 U.S.C. § 2.

83.     By knowingly bringing an infringement action in bad faith against MetroPCS, EMSAT has engaged in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," which is unlawful under Fla. Stat. § 501.201-13.

84.     EMSAT's unfair methods of competition and/or deceptive practices occurred in the conduct of "trade or commerce" within the meaning of FDUTPA.

85.     As a result of EMSAT's unfair business practices, MetroPCS has been aggrieved, and suffered actual damages.  MetroPCS seeks an injunction, damages, and any other equitable relief required to prevent further harm to itself, and to prevent EMSAT from continuing its unlawful, harmful, and anticompetitive conduct.

## COUNT V: DECEPTIVE ACTS AND PRACTICES UNDER N.Y. GEN. BUS. LAW § 349 *ET SEQ.*

86.     MetroPCS repeats and incorporates by reference the allegations of paragraphs 1 – 86, as though fully set forth herein.

87.     By knowingly bringing an enforcement action in bad faith against MetroPCS, EMSAT has engaged in "[d]eceptive acts or practices in the conduct of business, trade or commerce or in the furnishing of any service," which is unlawful under N.Y. Gen. Bus. Law § 349.

88.     MetroPCS is a "person" within the meaning of N.Y. Gen. Bus. Law § 349.

89.     EMSAT's deceptive acts and practices are directed at consumers and harm the public interest because its bad-faith enforcement action seeks to add additional costs to the FCC-mandated wireless E-911 system.

90.     EMSAT's deceptive acts or practices are materially misleading because its bad-faith enforcement of the '611 patent attempts to mislead consumers and the public into believing that the '611 patent is valid and enforceable.

91.     As a result of EMSAT's deceptive acts or practices, MetroPCS has been aggrieved, and has suffered actual damages.  MetroPCS seeks damages and any other equitable relief required to prevent further harm to itself and the public interests, and to prevent EMSAT from continuing its unlawful, harmful, and anticompetitive conduct.

### COUNT VI: TEXAS COMMON-LAW UNFAIR COMPETITION

92.     MetroPCS repeats and incorporates by reference the allegations of paragraphs 1 – 92, as though fully set forth herein.

93.     Texas unfair-competition law prohibits the improper interference by separate unlawful act with a party's ability to conduct its business.

94.     EMSAT's assertion of the '611 patent against MetroPCS with knowledge that it was fraudulently obtained and is therefore unenforceable has interfered with MetroPCS's ability to conduct its business, and has caused MetroPCS damages in an amount to be calculated at trial.

### COUNT VII:  DECLARATORY JUDGMENT OF NONINFRINGEMENT, INVALIDITY, AND UNENFORCEABILITY OF U.S. PATENTS '611, '404, '822, AND '763

95.     MetroPCS repeats and incorporates by reference the allegations of paragraphs 1 – 95, as though fully set forth herein.

96.     The claims of the '611, '404, '822, and '763 patents are invalid for failing to comply with the conditions and requirements of patentability as set forth in the United States

Patent Laws, Title 35 U.S.C., including specifically §§ 102, 103, and/or 112, and the rules, regulations, and laws pertaining thereto.

97.     The claims of the '611 patent are unenforceable due to inequitable conduct, procured using fraud, and the claims of the '822 and '763 patents are unenforceable under the doctrine of infectious unenforceability.

98.     MetroPCS' products, methods or services do not infringe any valid claim of the '611, '404, '822, and '763 patents.

99.     Accordingly, MetroPCS seeks a declaratory judgment under 28 U.S.C. §§ 2201-2202 that its products, methods or services do not infringe any valid claim of the '611, '404, '822, and '763 patents.

## COUNT VIII:  DECLARATORY JUDGMENT THAT PLAINTIFFS' CLAIMS MUST BE BROUGHT AGAINST THE UNITED STATES IN THE COURT OF FEDERAL CLAIMS

100.     MetroPCS repeats and incorporates by reference the allegations of paragraphs 1 – 100, as though fully set forth herein.

101.     EMSAT has alleged that MetroPCS infringes the patents-in-suit by reason of MetroPCS's compliance with the FCC's mandatory E-911 regulations.

102.     MetroPCS's provision of E-911 services in compliance with the mandatory FCC regulations constitutes "use or manufacture by or for the United States" within the meaning of 28 U.S.C. § 1498.

103.     Accordingly, MetroPCS seeks a declaratory judgment under 28 U.S.C. § 1498 that EMSAT's infringement claims must be brought against the United States in the U.S. Court of Federal Claims, and that this Court lacks subject-matter jurisdiction to hear such claims against MetroPCS.

## PRAYER FOR RELIEF

WHEREFORE, MetroPCS respectfully requests the following relief:

1.      A judgment that all of the claims of United States Patent No. 5,946,611 are invalid;

2.      A judgment that all of the claims of United States Patent No. 6,324,404 are invalid;

3.      A judgment that all of the claims of United States Patent No. 6,847,822 are invalid;

4.      A judgment that all of the claims of United States Patent No. 7,289,763 are invalid;

5.      A judgment that all of the claims of United States Patent No. 5,946,611 are unenforceable;

6.      A judgment that all of the claims of United States Patent No. 6,324,404 are unenforceable;

7.      A judgment that all of the claims of United States Patent No. 6,847,822 are unenforceable;

8.      A judgment that all of the claims of United States Patent No. 7,289,763 are unenforceable;

9.      A judgment that all of the claims of United States Patent No. 5,946,611 are not infringed by MetroPCS either directly or indirectly, literally, or under the doctrine of equivalents;

10.      A judgment that all of the claims of United States Patent No. 6,324,404 are not infringed by MetroPCS either directly or indirectly, literally, or under the doctrine of equivalents;

11.      A judgment that all of the claims of United States Patent No. 6,847,822 are not infringed by MetroPCS either directly or indirectly, literally, or under the doctrine of equivalents;

12.     A judgment that all of the claims of United States Patent No. 7,289,763 are not infringed by MetroPCS either directly or indirectly, literally, or under the doctrine of equivalents;

13.     A judgment that EMSAT has monopolized the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

14.     A permanent injunction enjoining EMSAT from monopolizing the relevant market under Section 16 of the Clayton Act, 15 U.S.C. § 16;

15.     An award of treble damages under § 4 of the Clayton Act;

16.     A declaration that EMSAT's actions constitute a violation of Cal. Bus. & Prof. Code § 17200 *et seq.*;

17.     A declaration that EMSAT's actions constitute a violation of Fla. Stat. § 501.201 *et seq.;*

18.     A declaration that EMSAT's actions constitute a violation of N.Y. Gen. Bus. Law § 349 *et seq.;*

19.     A declaration that EMSAT's actions constitute a public nuisance under Texas law;

20.     A declaration that EMSAT's actions constitute unfair competition under Texas common law;

21.     A declaration that EMSAT's claims must be brought against the United States in the U.S. Court of Federal Claims pursuant to 28 U.S.C. § 1498;

22.     A permanent injunction enjoining EMSAT from enforcing the Patents-in-suit against MetroPCS;

23.     A permanent injunction enjoining EMSAT from enforcing the Patents-in-suit against parties who comply with the FCC's E-911 regulations;

24.     A declaration that this case is exceptional within the meaning of 35 U.S.C. § 285;

entitling MetroPCS to an award of its reasonable and necessary attorneys' fees, expenses, and

costs incurred in this case;

25.     An award of MetroPCS's compensatory damages (general, special, and nominal),

including investigation costs and legal fees and costs, trebled as provided by law;

26.     An award of MetroPCS's punitive damages;

27.     Dismissal with prejudice of and a take-nothing judgment on EMSAT's Complaint

and Demand for Jury Trial; and

28.     All such other and further relief as the Court deems just and proper.

Dated:  July 22, 2009                      Respectfully submitted,

*/s/* Carmen E. Bremer
Nicholas Groombridge
Lead Attorney
New York State Bar No. 2171346
Danielle Rosenthal (*pro hac vice*)
New York State Bar No. 704268
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8906 Telephone
(212) 310-8007 Facsimile
nicholas.groombridge@weil.com
danielle.rosenthal@weil.com

T. Ray Guy
State Bar No. 08648500
Carmen E. Bremer
State Bar No. 24041009
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
(214) 746-7700 Telephone
(214) 746-7777 Facsimile
ray.guy@weil.com
carmen.bremer@weil.com

Harry L. Gillam, Jr.
State Bar No. 07921800
GILLAM & SMITH, L.L.P.
303 South Washington Avenue
Marshall, Texas 75670
(903) 934-8450 Telephone
(903) 934-9257 Facsimile
gil@gillamsmithlaw.com

Of Counsel:

Garreth A. Sarosi
State Bar No. 24039373
MetroPCS Wireless, Inc.
2250 Lakeside Blvd.
Richardson, TX 75082
(469) 330-4784 Telephone
(866) 715-8790 Facsimile
gsarosi@metropcs.com

**ATTORNEYS FOR DEFENDANT
METROPCS WIRELESS, INC.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this 22 day of July 2009.  Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.


/s/Michael Mitrayon
Michael Mitrayon